CROWLEY (REED v.). See Case No. 11,644.

CROWLEY (WALTON v.). See Case No. 17,-133.

———

## Case No. 3,450.

### The CROWN.

#### CURRY et al. v. The CROWN.

[5 Adm. Rec. 675–681.]

District Court, S. D. Florida. March 16, 1857.

##### SALVAGE COMPENSATION.

[1. Fifteen vessels, aggregating 1,161 tons and carrying 152 men, worked, so far as boisterous weather permitted, for 13 days, and until the stranded vessel broke up, and succeeded in saving cargo of the net value of about $123,000. *Held*, that the salvors were entitled to 19 per cent. of such value as compensation.]

[2. A salvor is entitled to no more than a fair compensation for his work and labor. Any allowance beyond that is a premium or gratuity given by the court on grounds of public policy, but which the salvor has no right to exact.]

[3. The fact that a large number of vessels and persons are employed in a salvage service is no reason that a greater amount of salvage should be allowed therefor than would be allowed to a less number sufficiently performing the same service.]

[4. The acts of the captain of a steamer in signaling one of the rescuing vessels, and informing those on board of the wreck, though occupying but a few minutes, should be considered, from motives of public policy, a salvage service, for which, under the circumstances, he should be allowed $50.]

[In admiralty. Libel by Richard Curry and others against the cargo and materials of the British ship Crown for salvage service. Also, petition of Rollins, master of the steamer Isabel, to share in the salvage.]

Wm. R. Hackley and Winner Bethel, for libellants.

S. J. Douglas, for respondent.

MARVIN, District Judge. This ship, laden with a cargo of cotton and grain, bound from New Orleans to Liverpool, on the 19th of January last, ran ashore on Ajax reef, one hundred and twenty miles from this port; and soon after filled with water. On the 21st, the steamer Isabel, on her way from Charleston to Havana, arrived, and her commander attempted to jerk the ship off, but without success. On the 22d, the schooner Relampago arrived. At this time the

ship lay in 12 and 13 feet of water, she drawing 17 feet. She was evidently bilged. The master employed the Relampago to assist in saving the cargo and materials. Other vessels soon after arrived, and in a day or two there were, in all, fifteen vessels, possessing an aggregate tonnage of 1,161 tons, and carrying, in all, 152 men, employed in saving the materials and cargo. The ship lay upon an exposed reef and the weather was, at times, too boisterous to permit the salvors to work at the wreck, and although they appear to have been diligent, and to have lost no time when they could work, yet, before they had fully discharged the ship, she broke up and went to pieces, causing the total loss of the grain and about 300 bales of cotton. They were employed in rendering the service 13 days, several of the vessels making two trips. The schooner Florida, worth about $8,000, while receiving cotton, from the ship, took fire, by the accidental upsetting of a lamp, and was totally consumed, with 250 bales of cotton. The total cargo saved is 2,916 bales, 851 of which were wet and damaged. The gross value saved, as ascertained in part by sales and in part by estimation, may be put down at $131,000, and the expenses of wharfage, storage, labor in landing and storing, reshipping, and the costs and expenses of this suit, may be estimated at about $8,000, leaving the net value about $123,000.

The only question in the case is the amount of salvage to be allowed, and before deciding it I will refer to a few cases decided, in other courts, both in this country and Great Britain; not that the cases I shall refer to are precisely like the one before me, but they involve similar and analogous principles, and throw some light upon the present question. I shall cite no case of derelict, for this class of cases is governed by principles analogous, but different somewhat from the principles involved in cases like the present. The Emulaus, laden with mahogany, logwood, coffee, and hides, struck on a reef, in Vineyard sound, Massachusetts, and filled with water. Fourteen persons from the shore were employed by the master in getting the coffee, hides, and provisions on shore, and in getting out anchors. The next day, in a snow storm, the vessel was hove off by the master and his assistants, and anchored. During the next night she capsized. The next day the captain employed the pilot boat Superior and the sloop Hero to tow the Emulaus to Edgartown, a distance of from 20 to 25 miles. After they had towed her a considerable distance, she was carried back by the current. In the course of the towing she struck upon a shoal and righted. With a good deal of exertion and risk, during that day, they got her to Edgartown. The season of the year was unfavorable, but the weather was not boisterous. Value $5,722; salvage $850, of which $100 was given to the 14 shoremen. [Case No. 4,480.]

The Elvira, laden with live oak, had encountered heavy weather, had been knocked down, lost both her masts, and blown off the coast. Under jury masts, she approached the Capes of Delaware, and was towed to Philadelphia in three days by a pilot boat. Value $2,700; salvage $300. [Case No. 6,015.] The Wm. Penn was ashore on an outside breaker off Charleston bar, in great peril. The steamer Gordon attempted to haul her off, but failed. Afterwards the steamer Jasper went out to her, in a stormy night, approached the ship at much peril, and hauled her off and brought her to Charleston. Justice Wayne, approving the principles established in 1 Hagg. 246, that salvage services rendered by steamers ought to be encouraged by larger rewards, on account of their great skill and power, gave for salvage $3,450 on a value of $23,000. [Case No. 1,965.] The Versailles, bound into Boston, struck a ledge of rocks in the night and was forced over and came to anchor. The wind was about northeast. The ship lay with both anchors out, her yards braced back with the larboard braces, with rocks about 50 feet off, under her larboard beam, which she was kept off of by her sails. Had the wind changed, she would have been in increased peril. Men from the shore came on board and assisted in pumping. In the afternoon a steamer went to her from Boston, and towed her in, she having nine feet of water in her. When hove out, it appeared that 30 feet of her keel was gone, two floor timbers, four or five naval timbers, and 20 futtock timbers were broken. Her plank upon these timbers were stove in, and the ceiling started inboard. Value $120,000; salvage $3,600. [Case No. 6,365.] The Blenheim, valued at £19,000, with 100 passengers on board, from Belfast to Liverpool, broke her shaft and was in a good deal of trouble. She made signal lights, and the steamer Nimrod, a valuable steamer, from Cork, approached her at 2 o'clock in the morning, lay by her until daylight, took her in tow, and carried her to Liverpool; time six hours. Value £19,000; salvage claimed £8,000, allowed £600. Four boats and 22 men, in a terrible storm, went out to save life in the harbor of Ilfracombe, beset with rocks, where the vessels were drifting against each other. One boat was stove; the men were saved by jumping on board the crashing vessels. The vessel saved valued at £6,000; salvage one-tenth. 1 Hagg. Adm. 83. Thirty salvors assisted the ship Vine, in distress near the Needles, three days and nights, and towed her into Portsmouth. Value £5,500; salvage £400. 2 Hagg. Adm. 1. Five boats and 22 men employed one month in getting off a stranded ship and cargo on —— sand. Ship and cargo valued at £1,000; salvage two-fifths, being £3 2s. a day for each boat, and 13 shillings 8 pence for each man. Id. 189. The Brothers struck upon the same sand, the same night. The ship was lost; the cargo saved by 15 boats and smacks, employed

14 days. Value £9,680; salvage awarded by commissioners confirmed by the court, £3,050, and £175 to a separate boat. Fifteen boats and 67 men. Id. 195. The General Palmer, anchored off Margate in a hurricane, had lost one anchor, and hoisted a signal for another. Two luggers went out to her, six men went aboard, and one lugger returned for an anchor and chain. By the advice of a pilot, the salvors ran the ship on a mud bank, where she lay in safety. The lugger which returned for the anchor being too small, a third one was employed which, at great risk, carried the anchor and chain to the ship. The ship was finally towed into port by a steamer, 50 salvors or lugger men. Value £30,000; salvage £500. Id. 323. The Oscar lost her anchors and unshipped her rudder on Long sand, off Harwick, and hoisted a flag of distress. Two smacks went to her assistance and assisted her five days, and got the ship into harbor. The master stated that they saved the ship by their exertions. Value £2,400; salvage £220. Id. 257. A lugger carrying five men, in a very squally dark night in the month of February, went into Dover for an anchor for the ship; was out all night in bad weather. Value £16,500; salvage £60. 3 Hagg. Adm. 90. The Marquis of Huntly was ashore on the Middle sand off Essex, in thick rainy weather. She hoisted a signal of distress, and eight smacks, valued at £200 each, with twenty-two men on the lookout in the ——, went to her assistance. In boarding, the salvors were in great danger from the surf and breakers. The master of one boat and a boy were washed out;—three boats were sunk, and three men drowned. The salvors threw overboard 40 tons of the cargo, and took all other means to get the ship off, and succeeded. Guns were fired on board the ship, for the smacks to keep near, during the night. The ship was loaded with government stores. Value £6,500; salvage £1,300. Id. 246. The Branken Moor was aground on a lee shore, without anchors, without a rudder, having more than four feet of water in her, and all hands working at the pumps. Several luggers worked at the ship. One went for an anchor, one took off the passengers, and most valuable articles. They got her into harbor. Value £10,500; salvage £2,000. Id. 373. The Salacia was driven on the rocks and thrown on her beam ends, in the Falkland islands, on the 20th of May, in which situation she was found by the ship Washington on the 12th of June. On the 17th and 18th, a survey was held by the masters of the two ships, and the master of the Washington undertook to get her off, and reshipped the cargo, and got her ready for sea on the 7th July, and carried her to Valparaiso, where she was bound. Value £40,000; salvage £2,100. As salvage, £1,000 for the loss of the sealing voyage by the Washington, and £200 to the master of the Washington for personal expenses incurred. 2 Hagg. Adm. 262.

To return to the case immediately under consideration. On the trial, the court was referred to the cases of The Brewster [Case No. 1,852], and The Yucatan [Id. 18,194], as being cases much like the one under consideration. The salvage decreed in both those cases has always been considered by the court as very liberal. The Brewster was much like the present. In that case the services were performed by twelve large vessels, carrying 133 men. The salvage was one-third, or $16,802, excluding $780 to divers. The men's shares were a fraction less than $50. In The Yucatan there were nine large vessels; the salvage was 43 per cent., which gave $15,116; the shares were about $62. In The Yucatan there was quite as much exposure and labor as in the present case. In The Emigrant [unreported], a late case, 19 per cent. upon the net value was allowed, making $13,863. In this case I think a larger salvage was given than ought to have been. The court was pressed for a decision at a time when it had a mass of business on hand, and it did not sufficiently take into consideration the facts that the services were rendered near this port, and that there was no danger of the ship's going to pieces, and that the cargo could not injure much more by any delay in saving it. The same rate of salvage allowed in The Emigrant applied to this case would be, in my judgment, reasonable and just. Nineteen per cent. on $123,000 gives a fraction over $23,000, which sum will be allowed for salvage. It will make the shares about $60. There ought not to be any increase in the general rates of salvages allowed in this court. When you have paid the salvor a fair compensation for his work and labor, you have done all that he has any right to demand. All that is allowed beyond that is a premium—a gratuity given by the courts on grounds of public policy—the promotion of which he has no more right to exact than any other person. That policy is to induce persons, by rewards, to perform salvage services, and, on this coast, to induce persons to engage in the performances of such services as a business; because it is supposed that their employment in this business will promote the interests of commerce. But no interest of commerce is promoted by the employment of more persons than are necessary to save the property that may be accidentally shipwrecked on this coast. And where as many persons are engaged in this business as are necessary for this purpose, it is evidence that the rates of salvage are sufficiently remunerative.

The present number of licensed wreckers on this coast is 33, possessing an aggregate tonnage of 1,733 tons, and carrying about 250 men. This number is undoubtedly sufficient, and probably more than sufficient, to save the property that may be shipwrecked at all ordinary times. And as for extraordinary emergencies, there is no more rea-

son for providing for these than when such emergencies happen upon any other coast. That the present rates of salvage are sufficiently remunerative is further shown by the facts that few persons once engaged in the wrecking business voluntarily leave it, and, whenever they do, their places are very soon supplied by others. Nor could any increase possibly result in any real benefit to the wrecking interest, for such increase would induce more persons to engage in the business, and an increase in the numbers would require a further increase in the rewards, and these, again, would increase the numbers, and so on toties quoties, until, in the end, the whole property might be taken for salvage, and, yet the interests of the persons engaged in the business advanced not one particle. Both the interests of commerce and of the wreckers require that the wreckers should be remunerated by a just, reasonable, and even liberal reward; but the interests of both commerce and the wreckers would be impaired by extravagant rewards; while, at the same time, such extravagance would be an unjustifiable invasion of the rights of property, evincing a disregard of all justice in the court.

It appears from the petition of Captain Rollins, of the steamer Isabel, that on his way down the reef he discovered, at a considerable distance ahead of him, the schooner Relampago, bound to Nassau. He thereupon hoisted his colors as a signal to speak the Relampago, and after the vessels had reached each other, he stopped the steamer and spoke to the master of the Relampago, informing him that the Crown was on shore. He was not heard distinctly by the people on board the schooner on account of the noise made by blowing off steam; otherwise the Relampago would have arrived about 10 hours earlier at the wreck; but as it was, in consequence of this information, the schooner, instead of crossing the Gulf to Nassau, went to the wreck, was the first vessel there, and rendered to the cargo important salvage services. Captain Rollins did not run out of course to give this information, but his acts consisted simply in hoisting his flag, stopping the steamer for a minute, perhaps two, and speaking to the people on board the schooner; and the question is, do these acts constitute a salvage service entitling him to be considered a salvor, with a lien on the cargo for his services? I was at first inclined to think they did not; that they were simply such acts as he was bound by the laws of common charity and humanity to perform without reward. But when I consider that all salvage rewards are given from motives of policy, to encourage the performance of services to the property of others exposed to peril on the sea; and that, whenever such services are rendered, they are rewarded as salvage services, although if similar services should be performed on land, they would not entitle the party by law to compensation, but it would be held that he had done no more than what the obligations of charity and the duties of a common humanity enjoined upon him, I cannot say that these of Captain Rollins are not stricti juris salvage services, they being performed at sea and contributing to save the property. And upon the same principle, I am disposed to think that whenever small boats, which perhaps could do no good at the wreck, go in search of larger vessels, with or without request, or procure, by any efforts of theirs, the assistance of larger vessels, and important salvage services are rendered through their instrumentality, they are entitled to be considered as salvors, and to be compensated according to the merit of their services.

It is therefore ordered and decreed that the principal libellants recover and receive, in full compensation for their services rendered the cargo and materials of the ship Crown, the sum of $23,000, to be divided among them according to their respective interests, and that it be referred to Commissioner Baldwin to make such division; that petitioner Rollins recover and receive $50 for his exclusive use in compensation for his services; and that, upon the payment of the sums and the costs and expenses of this suit, together with the wharfage, storage, labor bills, and other charges, the marshal restore the said cargo to Thomas Carrey, late master of said ship, for and on account of whom it may concern.